**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al.**

**and**

**Patricia Parisi, et al., Plaintiffs,**

**v.**

**Hugh L. CAREY, individually and as Governor of the State of New York, et al., Defendants.**

United States of America, Amicus Curiae.

Nos. 72 Civ. 356, 72 Civ. 357.

United States District Court, E.D. New York.

April 28, 1982.

Order July 13, 1982.

New York Civil Liberties Union, Paul, Weiss, Rifkind, Wharton & Garrison, Murray B. Schneps, Michael S. Lottman, Walter Redfield, New York City, Morton B. Dinker, The Legal Aid Society, New York City, Henry Weintraub, The Legal Aid Society, Brooklyn, N.Y., for plaintiffs; Christopher A. Hansen, Robert M. Levy, Diana T. Tanaka, Jonathan D. Siegfried, Helen Hershkoff, Elizabeth Koltun, James M. Beslity, New York City, of counsel.

LeBoeuf, Lamb, Leiby & MacRae, Robert Abrams, Atty. Gen., of N.Y., New York City for defendants; Taylor R. Briggs, Richard C. Cole, Kim Hoyt Sperduto, Lawrence Pollack, Joy Feigenbaum, New York City, Caren S. Brutten, Frederick K. Mehlman, Asst. Attys. Gen., New York City, of counsel.

Leonard Rieser, Timothy Cook, Terisa E. Chaw, Special Litigation Counsel Section Civil Rights Div., Washington, D.C., amicus curiae United States of America.

BARTELS, District Judge:

This is a motion by plaintiffs to declare the defendants in non-compliance with the 1975 Consent Judgment and to appoint a Special Master, and a counter-motion by the defendants to modify the Consent Judgment and vacate the court's Order of October 22, 1979.

In 1972 plaintiffs in this action instituted a suit against the State of New York alleging that living conditions and treatment programs at Willowbrook State School for the Mentally Retarded, now known as Staten Island Developmental Center, ("Willow-

brook") violated their constitutional and statutory rights and seeking at the same time preliminary injunctive relief to restrict certain abuses and to require improved care. In April 1973 Judge Orrin G. Judd granted relief to the plaintiffs by means of a preliminary injunction against the defendants directing certain enumerated items of relief in an attempt to correct deficiencies in order to protect the residents from serious physical harm. *NYSARC v. Rockefeller*, 357 F.Supp. 752 (E.D.N.Y. 1973). Subsequently, the United States of America, through its Civil Rights Division, entered the case as *amicus curiae*. Thereafter extensive negotiations were had between the parties and after the remaining points of contention were settled a consent judgment, approved by the court, was entered in April 1975. *NYSARC v. Carey*, 393 F.Supp. 715 (E.D.N.Y.1975).

The thrust of the Consent Judgment provided that defendants would reduce Willowbrook to an institution housing no more than 250 residents by April 1, 1981, and that they would transfer class members into community facilities of no more than 10 or 15 beds, depending upon the particular class member's level of functioning. The Judgment also required defendants to make extensive reforms at Willowbrook with regard to environment, staffing, programming, and various types of therapies. The Agreement included an Appendix A entitled "Steps, Standards and Procedures" which delineated in detail acceptable institutional living conditions and community placements, to which reference is hereby made. As explicated in the Judgment:

[t]he steps, standards and procedures contained in Appendix "A" hereto are not optimal or ideal standards, nor are they just custodial standards. They are based on the recognition that retarded persons, regardless of the degree of handicapping conditions, are capable of physical, intellectual, emotional and social growth, and upon the further recognition that a certain level of affirmative intervention and programming is necessary if that capability for growth and development is to be preserved and regression prevented.

Subsequently, in October 1979, plaintiffs and defendants entered into an agreement requiring the placement of half of the multiply handicapped residents of Flower Fifth Avenue Hospital, now known as Flower Hospital, into community facilities of no more than 3 beds and half into residences of no more than 6 beds.

In the six years since entry of the Consent Judgment litigation between the parties has revolved around questions of interpretation, implementation and enforcement of the Consent Judgment. On several previous occasions the parties have appeared before the court because the defendants had failed to live up to their obligations under the Consent Judgment.[1]

The motions presently before the court once again involve implementation of the Consent Judgment. Plaintiffs seek an order holding the defendants in non-compliance with the Consent Judgment, specifically those provisions of Appendix A relating to environment (§§ B, R); clothing (§ A(7)); programs and services (§§ B(7), D(1), (2), (5), F(1), (8), G(1), (2), J(1), K(1), (2)); staffing (§§ C(1), (3), (7), (8), L(1)); nutrition (§ H); and community placement (§§ A(1), V(2), (3), (9)). They seek an order demanding compliance, with all deliberate speed, with the community placement provisions of the Judgment, compliance with the other provisions within six months, and

---

1. Prior reported decisions in this case appear at 357 F.Supp. 752 (E.D.N.Y.1973); 393 F.Supp. 715 (E.D.N.Y.1975); 409 F.Supp. 606 (E.D.N.Y. 1976); 438 F.Supp. 440 (E.D.N.Y.1977); 456 F.Supp. 85 (E.D.N.Y.1978); 466 F.Supp. 487 (E.D.N.Y.), *aff'd*, 612 F.2d 644 (2d Cir.1979); 492 F.Supp. 1099 (E.D.N.Y.1980); 492 F.Supp. 1110 (E.D.N.Y.), *rev'd*, 631 F.2d 162 (2d Cir. 1980). Other opinions and orders were issued in this case, 72 Civ. 356/357, on March 5, 1976; March 8, 1976; March 10, 1976; March 30, 1976; February 7, 1977; February 8, 1977; March 10, 1977; June 10, 1977; September 7, 1977; October 11, 1977; October 17, 1977; March 21, 1978, *aff'd*, 596 F.2d 27 (2d Cir. 1979); March 28, 1978; April 26, 1978; September 15, 1978; September 24, 1978; September 29, 1978; October 2, 1978; June 6, 1979; October 22, 1979; September 9, 1980, *aff'd*, 661 F.2d 910 (2d Cir.1981).

the appointment of a Special Master who would monitor compliance and for whom the defendants would be ordered to provide necessary funding.

Simultaneously, defendants seek an order pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, modifying §§ V(1), V(4), and V(7) of Appendix A of the Consent Judgment and vacating the 3 bed/6 bed Order stipulated to and entered in this action on October 22, 1979. The proposed motion for modification would eliminate the requirements that all class members who are mildly retarded be placed in residential facilities of no more than 15 beds, all those who are more than mildly retarded be placed in residential facilities of no more than 10 beds, and that at least half of those class members residing at Flower Hospital be placed in community residences of no more than 3 residents and the remainder in facilities of no more than 6 residents. Instead the modification would permit defendants to develop a range of community-based facilities housing up to 50 residents.

Of a total original class size of 5343 Willowbrook residents, 1108 have been placed in community residences of the size mandated by the Consent Judgment, 580 have been placed in family care, 557 have died, and 730 have been discharged from state supervision. Of the remainder awaiting placement, 1369 live at Willowbrook (including the Karl D. Warner complex),[2] and 999 have been transferred from Willowbrook to other institutions managed by the State or private agencies. Such institutions include Brooklyn Developmental Center, a 500-bed institution (including the 50-bed Williamsburg annex) which houses 383 class members; Bronx Developmental Center, a 200-bed institution where 57 class members live; Manhattan Developmental Center, in which 107 of its 150 residents are class members; and Bernard Fineson Developmental Center, which houses 288 class members and which is comprised of three units, Corona, Howard Beach, and Glen Oaks. United Cerebral Palsy manages two facilities in which class members reside: Nina Eaton Center, a 48-bed facility which houses 46 class members and Castle Hill School, a 53-bed institution. In addition about 115 multiply-handicapped class members live at Flower Hospital. The focus of the plaintiffs' motion is living conditions at Willowbrook, but evidence of living conditions at the other above-named institutions was also presented. The defendants' proposed modification affects class members in any institutional setting [3] including the above institutions.

The Court has heard 25 days of testimony on these two motions. Both parties and *amicus* have called upon an impressive array of experienced experts and others. Thirty-nine witnesses in all have testified. Plaintiffs called as expert witnesses Dr. James Clements, Chairman of the Willowbrook Review Panel, member of the Joint Commission on Accreditation of Hospitals' Council on Services for the Retarded and Developmentally Disabled, past Director of the Georgia Retardation Center and past president of the American Association on Mental Deficiency; Kathleen Schwaninger, Assistant Commissioner for Mental Retardation in the Commonwealth of Massachusetts and former Executive Director of the Willowbrook Review Panel; Lyn Rucker, Executive Director of Region V Mental Retardation Services in Lincoln, Nebraska; and Gerald Provencal, Director of the Macomb-Oakland Regional Center in Mt. Clements Michigan.[4] Just as important, the

---

**2.** Willowbrook is a complex of several dozen buildings. Residents currently live in Buildings 5, 6, 9, 10, 11, 21, 23, 25, 32, 77, 12, 13, and 15. Buildings 12, 13, and 15 comprise the Karl Warner Complex managed by United Cerebral Palsy on behalf of the State of New York.

**3.** Class members also live in other developmental centers not directly referred to at the hearing. State-run developmental centers include Suffolk, West Seneca, O.D. Heck, Broome, Westchester, Letchworth, Syracuse, Wassaic, Wilton and Monroe Developmental Centers. Private institutions include Greenwood, Crystal Run, Hebrew Academy, Housing for the Disabled, and Margaret Chapman facilities.

**4.** Fact witnesses for plaintiffs were: Margaret Loomis, consultant to the American Civil Liberties Union ("ACLU") and past staff member of the Willowbrook Review Panel; Mary Sullivan, Manhattan Borough Representative of the Con-

plaintiffs introduced photographs of the conditions they found when they visited Willowbrook and related institutions.

Experts testifying for defendants included Dr. Richard Blanton, Associate Director of the Illinois Department of Developmental Disabilities; Barbara Blum, Commissioner, New York State Department of Social Services and former Director of the Manhattan Placement Unit; Marc Brandt, Executive Director, Sullivan County Association for Retarded Children; Dr. Ella Curry, Director of Willowbrook; Dr. Shervert Frazier, Professor of Psychiatry at Harvard University and former Texas Commissioner of Mental Retardation; Dr. Meredith Harris, Director, Nina Eaton Center; Helen Kaplan, Executive Director, Nassau Chapter of New York State Association for Retarded Children ("NYSARC"); Frank Padaven, State Senator and Chairman of the State Senate Committee on Mental Hygiene; Dr. Sue Allen Warren, Professor of Special Education at Boston University; and Zygmond Slezak, Acting Commissioner, Office of Mental Retardation and Developmental Disabilities ("OMRDD").[5] Experts called by the United States of America, *amicus curiae,* included George Gray, architect; Dr. Walter Hillabrant, psychologist; Brian Lensink, Assistant Deputy Director

of the Arizona Department of Economic Security in charge of Arizona programs for the mentally retarded; Dr. Andrew Lorincz, physician and Professor of Medicine at the University of Alabama; and Raymond Watts, Registered Sanitarian and environmental health consultant. Pretrial depositions and hundreds of exhibits, including illustrative photographs, have been entered as part of the record, and affidavits, briefs, and memoranda of law have been submitted. The record raises four main issues which the court will address seriatim: (1) Non-compliance with the Consent Judgment; (2) appointment of a Special Master; (3) modification of the Consent Judgment; and (4) Vacation of the 3 bed/6 bed Order of October 22, 1979.

## I

The non-compliance charge against the defendants involves a number of vital areas enumerated below with respect to which the court, after due consideration, has made the findings set forth in the following subheadings.

*Sanitation*

■ Section B(3) of the Consent Judgment requires that the living quarters and program areas be kept clean, odorless and insect-free at all times.[6] Contrary to that

---

sumers' Advisory Board ("CAB"); Anthony Pinto, CAB representative on the Willowbrook Incident Review Committee; Ann Nehrbaur, Chairperson of the CAB; Barbara Gacek, Director of Intermediate Care Facilities for St. Christopher Home; Ida Rios and Sandra Magri, mothers of class members; Martin Van Hall, Midlevel Supervisor at Bronx Developmental Center; and Albert Pfadt, Administrator of the Willowbrook toilet-training program.

5. Fact witnesses for defendants were: Dr. Harold Brandwein, Acting Deputy Director for Treatment Services at Willowbrook; Peter Behrle, Chief Budgeting Analyst, Office of Mental Retardation and Developmental Disabilities ("OMRDD"); Mary Delaney, Senior Consultant and Physical Therapist, OMRDD; Chuck Devane, Director of Human Resources Management, OMRDD; Anthony DiNuzzo, Director of Office of ICF/MR Survey Operations; Cora Hoffman, Special Assistant to the Commissioner, OMRDD; Ed Matthews, New York State Facilities Development Corporation; Richard Roberts, Speech Pathologist of Willowbrook Deaf-Blind Program; James Walsh, Deputy Di-

rector for Institutional Administration at Willowbrook; Joseph Weingold, former Executive Director of New York State Association for Retarded Children ("NYSARC"); and Dr. Philip Ziring, Chairman of Pediatrics at Morristown Memorial Hospital and former Deputy Director of Clinical Services at Willowbrook.

6. Section B requires in pertinent part that:
  1. Defendants shall provide living facilities which afford residents privacy, dignity, comfort and sanitation. This shall include but not be limited to:
  ... adequate toilet paper, soap, towels, linen and bedding; ... separate clean and dirty linen storage areas.

  . . . . .

  3. Every building shall be kept clean, odorless, and insect-free at all times .... In particular, lavatory areas are to be cleaned as often as necessary every day, and bathtubs shall be cleaned after the bath of each resident.
Section H requires in pertinent part that:

provision, sanitation at Willowbrook is totally unsatisfactory and presents a serious health hazard to the resident population. Of particular concern is the filthy condition of the kitchens and bathrooms. Both the main kitchen, where the residents' food is prepared, and the satellite kitchens, where the residents' food is served, are filthy and infested with rodents and cockroaches.[7] Cups, bowls, silverware, and pots and pans are improperly cleaned and often caked with food from past meals. Food is served to residents at inappropriate temperatures that encourage food spoilage and the growth of microorganisms, and food storage areas are dirty and foul-smelling. (See, e.g., T. 2084–2089, 2091–92, 2095–96; P. Exs. 143, 146, 148).

Sanitation of the bathrooms in virtually every residential building at Willowbrook is grossly inadequate. Human feces and urine commonly soil bathroom floors, walls, toilets and shower stalls. Non-operational and unflushed toilets filled with human excrement are frequent occurrences, as are cracked and missing toilet seats and bathrooms without toilet tissue, towels and soap.

Mold and mildew, indicative of long-term neglect, grow on many shower surfaces and none of the shower areas are being properly sanitized.[8] (See, e.g., T. 90, 113, 127–130, 1811, 1850–51, 2124, 2133, 2181; P. Exs. 70A–2, 70A–3, 70A–14, 70C–167, 123, 153, 154, 156, 158).

These types of unsanitary conditions permeate the residents' entire living space.[9] Residents, many of whom are nonambulatory, must eat in dining rooms infested with insects and rodents, sit and lie on floors that are dirty, not uncommonly with human excrement, and sleep in bedrooms reeking of urine.[10] Their clean clothes and dirty laundry are intermingled, and trash, food, and clothing litter the floors. (See, e.g., T. 97–100, 116–130, 2107, 2132–33, 4914, 4918; P. Exs. 1, 153, 154, 161, 165, 258, 70A–4, 70A–9).

Defendants have made some efforts to improve sanitation. During her 14-month tenure, Dr. Curry has closed six buildings and increased in-service training efforts. Clearly, however, defendants have not done enough. The evidence shows that during the last two years at Willowbrook, sanita-

---

5. Dining areas and food storage, preparation, and distribution shall be in compliance with state and local sanitation requirements. There shall be sufficient dishes and utensils for all residents, which shall be thoroughly cleaned between uses.

6. Food shall be prepared by methods that preserve nutritive value, served at normal temperatures, and protected from contamination in transport and storage.

7. In the main kitchen alone Raymond Watts, who surveyed Willowbrook for amicus, counted twenty violations of the Food and Drug Administration Standards for food service operations.

8. To cite just a few examples of the deplorable sanitation in Willowbrook bathrooms: (a) In July 1981 the Quality of Life Committee, an internal auditing group, reported on the Central Client Bathroom in Building ICF/32 and found a severe odor of feces, urine and mildew, feces on one of the shower stall floors, feces smeared on one toilet, another toilet unflushed and no soap (P.Ex. 156); (b) In June 1981 Dr. Clements toured Building 6. He testified that he observed a pile of feces in a shower, a toilet seat covered with feces and urine and toilet stalls without toilet tissue. (T. 90; P.Exs. 70A–2 & 70A–3); (c) Commissioner Schwan-

inger testified that in January 1982 she saw a bathroom in Building 9 with eight toilets, every one of which was without toilet paper, was filled with feces and with feces and urine stains on the toilet seats. (T. 5670–71; P.Ex. 70C–167); (d) Lyn Rucker testified that on September 6, 1981 many of the bathrooms in Building 77 were unflushed and were filled with feces. The bathrooms reeked, and there were vomit and feces in the toilet stalls. (T. 1850–51).

9. Two of the defendants' witnesses, Dr. Ella Curry, Director of Willowbrook, and James Walsh, Deputy Director for Institutional Administration at Willowbrook, acknowledged that the level of cleanliness at Willowbrook is unacceptable. (T. 2699–2700; P.Ex. 259). Audits conducted by the State repeatedly cite serious sanitation deficiencies. (See, e.g., P.Exs. 1, 153, 154, 155, 156, 158, 160, 161, 162, 253, 258).

10. Dr. Clements reported a particularly distressing incident. A resident in Building 8 lunchroom was soaked in urine and with a puddle of urine beneath him. When asked to clean it up, an employee retorted that it was not her job. Meanwhile, the resident dropped his spoon in the puddle, picked it up and continued to eat with it. (T. 106).

tion in the remaining buildings, rather than improving, has steadily deteriorated. (*See, e.g.,* T. 109, 494, 3368–72, 5675).

Sanitation at other related facilities where class members have been transferred is not markedly better than that at Willowbrook. The Bronx Developmental Center has a serious infestation problem, and bedrooms, dining rooms and bathrooms there are dirty. At Brooklyn Developmental Center the most serious sanitation problems result from its location next to a dump. Smells from the dump waft over the institution, debris floats onto the grounds and flies swarm throughout the buildings. Moreover, the residential areas there are unclean. The level of sanitation in residential areas at Glen Oaks and Nina Eaton Center is also unsatisfactory. (*See, e.g.,* T. 131–34, 151–52, 161, 500–502, 540, 1204–1209, 5813; P. Exs. 70A–15, 70A–16, 70A–95, 70C–142, 70C–145, 82, 97, 98).

*Maintenance* [11]

Part of the maintenance problems at Willowbrook, a 50-year-old complex, results from the fact that for years virtually no capital was poured into the physical plant, and until recently no preventive maintenance measures were taken. The most glaring maintenance inadequacies, though, stem from present, not past, neglect. For instance, throughout the institution shower fixtures lack vacuum breakers which are easy to install and necessary to prevent the transmission of contaminated water. Water control boxes are left open, allowing residents access to the control of the facility's water temperature. Most of the sleeping areas lack curtains, wall decorations, and other personalizing touches. In almost every building there are numerous examples of torn and broken furniture, ripped and broken screens, missing bathroom tiles, nonworking toilets and walls with gaping holes. In many residential areas furniture is sparse and the noise level piercing. (*See, e.g.,* T. 312, 648, 1262, 1544, 2099, 2125–27, 5666, 5673; P. Exs. 70B–101, 160, 258).

According to the state's own auditing teams, Willowbrook's maintenance deficiencies are extensive. The March 1981 audit conducted by OMRDD's Audit Compliance Task Force indicated that the level of compliance with the Consent Judgment's "physical environment" requirements was 43.6%. Deficiencies included lack of privacy in bedroom and bathroom areas, poor lighting, a dearth of decorations, curtains and furniture, and broken water faucets. (P. Ex. 1). Six months later the deficiencies, as measured by the September 1981 audit conducted by Willowbrook's Quality of Life Committee, were even more widespread. A greater number of areas lacked decorations

---

11. Sections B and R require in pertinent part that living quarters

[B1] shall include, but not be limited to:

—accessible, private and easily usable toilets and bathing facilities, including specialized equipment for the physically handicapped;

—accessible and easily usable sinks and drinking facilities;

\* \* \* \* \* \*

—individual bed and dresser or storage place;

—attractive, comfortable and spacious living and sleeping areas;

—attractive and normalizing furnishings and leisure equipment, including materials to reduce noise level;

—normal temperatures and adequate ventilation;

\* \* \* \* \* \*

2. Living areas shall be sectioned and partitioned so that no more than eight residents live or sleep in one unit. Programming and working areas shall be quiet, appropriately designed and conducive to programming. Architectural barriers which impede living and programming for handicapped residents shall be corrected or removed. Residents shall be encouraged to decorate their living areas and furniture.

[R1] All necessary steps shall be taken to correct health and safety hazards, including the covering of

radiators and steam pipes in a manner to protect residents from injury, the prompt repair of broken windows, and the removal of cockroaches and other insects and vermin.

\* \* \* \* \* \*

6. Defendants shall establish and maintain a program of adequate maintenance of buildings and equipment which shall include prompt elimination of existing maintenance backlogs.

\* \* \* \* \* \*

8. Floors in living or sleeping areas other than dining or bathroom areas shall be provided with carpets or rugs, consistent with a pleasant, clean, quiet and safe residential environment.

and bedspreads, fewer soap dispensers were available, and insects and rodents, reportedly under control in March, infested 75% of the buildings. In addition, there was an absence of bathroom safety devices in 68.75% of the buildings, 75% of the buildings had windows and screens that were dirty, broken, and in disrepair, 68.75% of the buildings provided inadequate lighting and 62% had broken sinks. (P. Ex. 253).

Maintenance at Brooklyn and Bronx Developmental Centers, Glen Oaks and Williamsburg presents a similar scenario. The most common problems are poorly maintained and nonworking bathrooms, holes in the walls and barren living spaces. Many of the residents' rooms at Nina Eaton Center are decorated, and it is a pleasanter atmosphere, but there too room repairs are not kept current. (*See, e.g.,* T. 158–160, 175–81, 500–01, 536–43, 668, 722, 1077, 1126, 1598–99, 4936; P. Exs. 70A–17, 70A–22, 70A–33, 70A–35, 82, 98).

*Clothing*

It is overwhelmingly evident that defendants have not fulfilled their agreement to provide class members with "clean, adequate and seasonally appropriate" clothing.[12] Some residents at Willowbrook are partially clothed, others go nude, and many wear clothes that are illfitting, badly torn and stained. Shoes are broken and torn, and in winter many of the residents are outfitted in summer attire. In most of the residential buildings clothing is inadequately stored and sorted, residents are not provided with individualized dress, and the clothing supply is chronically short. (*See, e.g.,* T. 218–225, 494–95, 508, 1819, 3249–

3258, 3433–3439, 5666; P. Exs. 70A–45, 70A–46, 70A–49, 70A–62, 70A–63, 70A–66, 70A–68, 135).

The insufficient supply of clothing has an adverse effect on residents' programming. The court adopts the conclusions of Mary Sullivan, Manhattan Borough Representative of the Consumer Advisory Board ("CAB"), that a major programming problem at Willowbrook is residents not attending programming because they have nothing to wear. The court also accepts the testimony of Albert Pfadt, the Administrator of the Willowbrook toilet-training program, that his efforts are seriously hampered by the frequent unavailability of clothing changes and illfitting clothes that are pinned shut so residents cannot take off their clothes independently.

Certain difficulties are endemic to the population at Willowbrook.[13] Some residents tear their clothing and disrobe. Incontinent class members need frequent changes, and a few with neurological problems cannot be toilet-trained. Most residents, though, can be taught not to disrobe or rip their clothes and most can be trained to use the toilet. In any event, as Dr. Curry, the Director of Willowbrook, acknowledged, the task of providing enough clean, decent clothing to the population at Willowbrook is not insurmountable. (T. 3260).[14] The fact that a job is difficult does not excuse its nonperformance.

Residents of the Brooklyn Developmental Center, the Bronx Developmental Center and Nina Eaton Center are also improperly dressed. At the Bronx Developmental Cen-

---

**12.** Section A(7) provides:

Residents shall be provided with clean, adequate and seasonally appropriate clothing, including shoes and coats, which shall be readily accessible for residents' use. Such clothing shall be comparable in styles and quality with clothing worn by persons of similar age and sex in the community.

**13.** The great majority of class members awaiting placement is profoundly or severely retarded with an equivalent functional level between that of a twelve-month-old infant and a two-year-old child. Moreover, some display maladaptive behaviors, many are non-ambulatory,

and some have other physically handicapping conditions, such as blindness, deafness, scoliosis, asthma, respiratory problems, cerebral palsy, and cardiac and renal conditions.

**14.** State audits in March 1981 and September 1981 confirm egregious clothing deficiencies at Willowbrook. In March the auditors from OMRDD found noncompliance with five of seven standards measuring compliance with the clothing provisions of the Consent Judgment. In September, the Willowbrook Quality of Life Committee found six of seven standards out of compliance.

ter there often is not enough underwear, so residents go to programs without it. Outer clothing is in short supply, so residents either go out in public in inappropriate or frayed clothing or have to remain on their unit. For example, in January 1981 one class member, J.D., missed participating in the New York State Special Olympic Games because he lacked winter clothing. (*See, e.g.,* T. 217–18, 241, 521–22, 1117–1119, 1875–76; P. Exs. 70A–56, 70A–57, 70A–59, 70A–60, 70C–141, 82, 132, 135).

*Programming*

Mentally retarded individuals, even those severely and profoundly retarded, are capable of growth. If a mentally retarded individual is to develop, though, he must be provided with programming that is geared to meet his individual needs at his own level of development. To that end the Consent Judgment requires the formulation of an individual program plan for each class member and the provision of six hours of formal programming each weekday.[15]

There are four major program areas at Willowbrook. In the Elizabeth Connelly Center (Building 8) the lowest functioning residents receive programming in the areas of sensory stimuli, body awareness, personal hygiene and activities of daily living. Those clients who do not need basic skills training are taught conceptual skills in the Education Building (Building 3). In the Work Activity Center (Building 61) the highest functioning residents[16] work on contracts, in five different work areas of varying difficulty, in exchange for compensation. In addition, 39 residents who suffer from both visual and aural deficiencies, participate in the Deaf-Blind Program (Building 2), the goal of which is to help them become as self-sufficient as possible.

Although the Willowbrook administration has constructed a commendable framework in which to provide programming, serious deficiencies exist in the delivery of programs. Residents rarely receive six hours of appropriate programming. Often they arrive late at the program area or do not arrive at all because of lack of transportation or clothing. At least five residents in Building 21 do not attend *any* programming outside of their residence, and there is no indication that their residence provides them with any structured activity. Even when residents do arrive at their programs, they receive little actual instruction. Residents sit idly, walk about aimlessly, self-stimulate and sleep. They are frequently left unattended, and even when staff is present, interaction between staff and residents is minimal. While some programming at Willowbrook, notably the Deaf-Blind program, is first rate, programming compliant with the Consent Judgment is the exception rather than the rule. (*See, e.g.,* T. 259–60, 274–75, 1416–25, 5533–43; P. Exs. 1, 70A–78, 70A–80, 70D–158, 70D–160, 117, 118, 119, 123).

A contributing factor to the low quality of programming at Willowbrook is deficien-

---

**15.** Section D provides, in pertinent part, that:
 1. Each resident shall have an individual plan of care, development and services (referred to hereafter as the "development plan"), which shall be prepared and re-evaluated at least annually by an interdisciplinary team of direct care and appropriate professional staff, as described in this judgment, after comprehensive diagnostic testing and evaluative screening, with the assistance of the resident, his or her parents, relatives or guardian. The development plan shall include all education, speech, physical therapy or other plans required by this judgment. The development plan shall be regularly reviewed by the team, at least quarterly.
 2. Each development plan shall describe the nature of the resident's specific needs and capabilities, his or her program goals, with short range and long range objectives and timetables for their attainment. The development plan shall provide for six (6) scheduled hours of program activity per weekday, designed to contribute to the achievement of objectives established for each resident, and each resident shall receive six hours of such program activity per weekday.... The development plan shall state criteria for release to less restrictive settings, including criteria and projected date for release, discharge, or transfer to a community placement, and programming necessary to achieve such release, discharge or transfer.

**16.** Seventy-five of Willowbrook's highest functioning clients attend workshops in the community.

cies in program design. Defendants have been remiss in developing and implementing individual development treatment plans, as prescribed by the Consent Judgment. The individual plans, developed at case conferences by an interdisciplinary team, are dependent upon written staff evaluations and staff participation at the meetings. Written evaluations are consistently missing, and staff attendance at the conferences is deplorably low.[17] Because of inadequate staff input, the interdisciplinary team is unable to develop an accurate assessment of clients' needs and cannot establish effective program goals. Often the resultant program plans are neither comprehensive nor accurate. They do not address the whole range of the residents' needs, and they prescribe goals that are inappropriate or have already been attained. Even when program plans are up-to-date and complete, direct care staff is often unaware of what the treatment plan and goals are and fails to implement the program prescribed by the treatment committee.

While programming at Flower Hospital and Nina Eaton Center appears to be satisfactory, programming efforts at the Bronx, Brooklyn, and Manhattan Developmental Centers mirror those at Willowbrook. (See, e.g., T. 528, 1459, 1870–72, 5688–89, 5706–07; P. Exs. 70–C–151, 82, 98, 135).

17. Ms. Sullivan evaluated attendance at 110 case conferences she attended at Willowbrook between March 30, 1980 and June 12, 1981. At 90 conferences staff members were missing: in 59 instances direct care staff, in 32 instances nurses, and in 21 instances program staff. At 16 conferences both program and direct care staff were missing, and 23 out of 45 times a doctor, scheduled to attend a conference, was absent. Ms. Sullivan also evaluated the number of written staff evaluations that were not completed. Of a total of 97 conferences, at 83 written staff evaluations were missing; 45 times, 3 or more evaluations were missing; and 17 times, 5 or more evaluations were missing.

18. Section K requires, in pertinent part, that:
    1. Individualized physical therapy services on a regular basis (including 7 days a week where needed) shall be provided to those residents who can benefit therefrom, including all cerebral palsy residents and all non-ambulatory residents and shall include positioning, feeding

*Special Therapies* [18]

Many Willowbrook residents diagnosed as needing recreational, occupational, physical, speech and psychological therapy are not receiving these services. Although a large number of residents have serious behavior disorders, no behavior modification program was established at Willowbrook until September 1981, and then it was only made available to four residents. Adaptive and positioning equipment is critical for many Willowbrook class members. If used correctly, it can prevent the progression of such debilitating conditions as scoliosis, curvature of the spine and other severe orthopedic handicaps. If the equipment is not used, though, or if it is misused, individuals who require it can suffer further deformities and can develop acute medical problems. The lack of and misuse of adaptive and positioning equipment at Willowbrook is widespread. Dr. Lorincz, a physician who toured Willowbrook for *amicus,* testified that he did not see one instance of appropriately used adaptive equipment. The court adopts his characterization of Willowbrook's misuse of adaptive and positioning equipment as a medical emergency. (*See, e.g.,* T. 5335–37, 5339–42).

*Recreation* [19]

Life in the residential units of Willowbrook, Bronx Developmental Center, Brook-

programs, self-ambulation programs, intervention and activation . . .
    2. Sufficient numbers of qualified staff and personnel shall promptly evaluate all non-ambulatory and physically handicapped residents to determine the number of wheelchairs (including electric), braces, orthopedic shoes, walkers, crutches, positioning equipment, bolsters, helmets, adaptive chairs, etc., that are needed. Such equipment shall be ordered and/or constructed and issued as quickly as possible. Carpenters shall be employed to make adaptive equipment, tailored to the physical needs of individual residents.

19. Section B7 provides, in pertinent part, that:
    7. Toys and equipment shall be readily accessible to residents during waking hours.
Section G provides, in pertinent part, that:
    1. There shall be a recreation program at Willowbrook which meets the recreational needs of each resident, as set forth in his or her development plan described in section D,

lyn Developmental Center, Manhattan Developmental Center, Nina Eaton Center and Glen Oaks is sterile, dreary and one of enforced idleness. Contrary to the Consent Judgment's requirement of two hours of recreation daily, most class members, when not in their program areas, have nothing to do. There is virtually no recreation equipment, toys or games on their units, and very little organized leisure-time activity occurs. In fact, the high incidence of behavior problems among institutionalized class members is at least partially attributable to the residents' long hours of idleness.

The residents' idleness is also counterproductive to their learning of new skills. In order for profoundly and severely retarded individuals to benefit from programming, the skills they learn must be constantly reenforced. Staff on residential units must support and provide continuity for daytime program efforts, such as teaching residents to brush their teeth, to toilet and dress themselves and to refrain from self-abuse. Regrettably, however, on none of the residential units does there appear to be any carryover of daytime skills training. (*See, e.g.*, T. 1544, 1821–22, 5629–30, 5545–46; P. Exs. 1, 128).

*Nutrition* [20]

The Willowbrook diet card system, established to ensure that residents who require special diets receive them, is not being properly administered. Most residential buildings lack current diet cards, and when they are available, staff does not always consult them. Consequently, residents who need special diets do not consistently receive them. At least one Willowbrook resident choked to death as a result of being served an improper diet.[21]

Only two residential buildings at Willowbrook provide residents with feeding programs, as prescribed by the Consent Judgment. Moreover, the only utensils given to most residents, regardless of their functioning level, are spoons, and often there are not even enough of them to go around. The Bronx Developmental Center, Brooklyn Developmental Center and Nina Eaton Center similarly fail to provide residents with feeding programs and adequate utensils. (*See, e.g.*, T. 538–40, 694, 1121–23, 5691–92, 5701, 5787; P. Ex. 102).

*Staffing Ratios*

The Consent Judgment mandates minimum staffing requirements for direct care staff and mid-level supervisors.[22] The

as to design of equipment, functional level, and physical or visual handicap. There shall be enough recreational equipment to provide adequate recreation services to all residents. There shall be special emphasis on equipment for lower functioning residents. The recreation program shall conform as closely as possible to normal community recreation activities, in particular in terms of equipment, age and sex grouping, facilities and surroundings.
2. Unless there is a medical order to the contrary, a minimum of two hours per day of recreation activities shall be provided for each resident, and weather permitting, recreation activities shall take place outdoors.

20. Section H provides, in pertinent part, that:
1. Consistent with their capabilities and handicaps, residents shall be taught to feed themselves and shall be fed both hot and cold foods and beverages in a normal fashion with due regard for personal hygiene (including washing hands of residents before and after every meal), use of utensils, appropriate quantities of food, appropriate dining room surroundings, meal schedules which correspond to normal community standards with

no less than 30–45 minutes allotted for each resident's meal. Where appropriate, residents shall be taught to eat in leisurely family style and to choose their own quantities and items according to individual tastes and preferences. Direct care staff shall be trained in and shall utilize power feeding techniques.
2. A nourishing, well-balanced nutritionally adequate diet shall be provided ... there shall be a mechanism for ensuring that residents who require special diets receive them.

21. Willowbrook resident "V" was on a prescribed ground food diet. His diet card indicated he was not to be given extra bread. Staff did not consult the diet card and gave him cubed meat and a roll. Staff unsuccessfully attempted the Heimlich maneuver and tried to save him by using the unit's resuscitator, but the resuscitator was inoperative. The Special Incident Review Committee found that dietary cards were not used on that unit, and supervisors were not properly instructed on the dietary card procedures. (P.Ex. 79).

22. Section C provides, in relevant part, that:
1. Each resident at Willowbrook shall receive appreciable and appropriate attention

aggregate number of staff employed at Willowbrook is sufficient to comply with the staffing requirements of the Consent Judgment. Yet, defendants consistently fail to provide class members with the required level of supervision. Part of the problem is lack of staff training, lack of staff dedication, and staff negligence. Even when enough employees are on duty, residents are frequently left unattended or attended by fewer than the mandated number of employees. Even when sufficient staff members are present, they often ignore residents, depriving class members of the "appreciable and appropriate attention by direct care staff" as required by the Consent Judgment. The difficulty in terminating civil service employees could be one explanation. Another explanation is the failure of management to provide direct care staff consistent enough supervision. Moreover, because of absenteeism and lateness, which are chronic problems at Willowbrook, many employees must work overtime. Working long tours with severely retarded clients creates a considerable strain on employees and contributes to their poor attention to residents' needs.

Staff deployment at Willowbrook is also deficient. As defendants note, Willowbrook is compliant with direct care and mid-level staffing requirements measured on a weekly and institution-wide basis. The Consent Judgment, however, requires compliance by building. Just because sufficient staff is on duty on an institution-wide basis does not mean that employees are properly deployed to each building, so that all class members receive adequate care. Moreover, measuring compliance on a weekly basis is misleading, and it does not adequately further the Consent Judgment's goal of providing class members with appropriate care. If the institution has a shortage of staff some days of the week and a surplus other days of the week—such as often occurs on paydays—the average for the week may come out even and the days out-of-compliance may be hidden, and the problem of understaffing ignored.

Measured on a daily, building-by-building basis defendants do not consistently provide class members with the direct care and mid-level staffing ratios mandated by the Consent Judgment. Plaintiffs introduced a series of charts showing defendants' level of non-compliance for direct care staff for the day and evening shifts at Willowbrook, Bronx Developmental Center, Glen Oaks, Brooklyn Developmental Center and the Corona unit of the Bernard Fineson Developmental Center and showing mid-level staffing on the day and evening shifts at Willowbrook and the Bronx Developmental Center. (P. Ex. 61). These charts show serious staff shortages. For example, out of a total of 665 shifts on a building basis at Willowbrook, on only 26 shifts were all of the buildings in compliance.

The defendants challenged the plaintiffs' findings of Willowbrook direct care staffing

each day from the direct care staff in his living unit, whose primary responsibility shall be the care and development of each resident. . . .

2. Willowbrook shall employ and maintain sufficient therapy aides at the grade 7 and 9 levels to ensure that the following numbers shall be present and on duty:

a) During the hours of the day and evening when residents are awake:

1) One therapy aide for every four residents in buildings primarily for residents who are children non-ambulatory or multiply handicapped, and for those residents receiving intensive psychiatric care;

．　　．　　．　　．　　．

3) One therapy aide for every resident receiving an intensive behavior modification program;

4) One therapy aide for every six residents for all residents and buildings not covered above;

b) During sleeping hours, an average of one therapy aide for every twelve residents on an institutional basis.

＊　　＊　　＊　　＊　　＊　　＊

7. Sufficient mid-level supervisors, i.e., grade 11 and grade 13 therapy assistants, or registered or practical nurses where appropriate, shall be employed to ensure that there will be one such person present on duty per 24 residents on both the first (day) and second (evening) shifts, and one such person present on duty for every 48 residents on the third (night) shift. . . .

deficiencies on the ground that the underlying data, the "Daily Compliance with Staffing Ratios" forms, which were prepared by Willowbrook staff, cannot be used to measure staffing compliance unless three adjustments are made: (1) the factoring out of level of staffing compliance in the so-called shared-staff buildings, managed for the state by United Cerebral Palsy; (2) an adjustment of staffing requirements to account for residents who are away from their buildings, who are "on leave;" (3) an adjustment for the availability on a building-wide basis for staff members assigned on a one-to-one basis to particular class members. James Walsh, Willowbrook Deputy Director of Institutional Administration, interpreted Section C(4) of the Consent Judgment as permitting that type of averaging. That section provides for lower ratios in certain living units within a building to provide higher staff-to-resident ratios in another living unit in the same building "provided that such deviation is not regular, chronic or permanent . . ."

The court agrees that in order to accurately measure Willowbrook's direct care staffing levels, plaintiffs' charts must be adjusted to account for residents on leave. If residents are absent from a building, naturally the number of staff required in that building decreases proportionately. The defendants' other adjustments, though, clearly lack merit. The first adjustment, that the staffing deficiencies in the shared-staff buildings must be ignored, is invalid. Defendants cannot avoid accountability under the Consent Judgment by contracting for services with private agencies. Moreover, in the buildings at Willowbrook managed by United Cerebral Palsy, direct care staff are *state* employees, and although United Cerebral Palsy schedules shifts, the state is responsible for staff assignments there and for sending the shared-staff buildings "pool" employees to cover staff shortages.

Defendants' contention that they should not be penalized for providing enriched, *i.e.,* more intensive, staffing than is required by the Consent Judgment is also unpersuasive. As defendants acknowledge, Willowbrook residents are generally assigned one-to-one staffing because they have severe behavior problems. Willowbrook's enriched staffing program appears to the court to be a diluted form of behavior modification program prescribed by the Consent Judgment. In any event, it is clear that employees assigned to enriched staffing are not available to supervise other residents. The result of defendants' suggested adjustment to the staffing requirements would suggest approval of inadequate staffing for many class members not on enriched staffing. Section C–4 of the Consent Judgment does not condone that type of statistical juggling. Its purpose is merely to permit defendants some flexibility in dealing with unusual staffing demands that are not "regular, chronic or permanent."

The one appropriate adjustment to defendants' compliance forms—to compensate for residents on leave—does modify plaintiffs' claims. However, even after making this adjustment, the court must conclude that defendants generally are not in compliance with the Consent Judgment staffing requirements. In particular, on the evening shift and on weekends few residents are on leave, and the charts' showing of consistent noncompliance with respect thereto remains virtually unaltered. For example, on the August 1, 1981 day shift, which was a Saturday, the adjustment for residents on leave does not change staff requirements, as measured by the plaintiffs' chart, in any building, except two, whose requirements are reduced by one employee. Accordingly, the direct care staff deficit on that date is 27 as opposed to a deficit of 29, as claimed by plaintiffs.

Defendants also challenge the mid-level staffing deficits at Willowbrook as submitted by plaintiffs. They contend that plaintiffs should have counted on-duty nurses as supervisors in order to offset mid-level supervisory shortages. Section C(7) of the Consent Judgment does contemplate nurses serving as mid-level supervisors under certain circumstances. Defendants' forms which plaintiffs utilized in preparing their charts indicate those tours when a

nurse is so utilized. Since the plaintiffs did count Willowbrook nurses as supervisors when defendants' forms indicated that that was their function, this objection by defendants is groundless.

Another inadequacy in staffing is the failure of the defendants to provide class members with an adequate number of case managers. On September 9, 1980 the court issued an order requiring the state to provide one case manager for every 20 class members. The state has not complied with this order. Eight case managers in the Bronx with class members on their caseload carry more than 20 clients; in Manhattan one case manager carries more than 20 clients and, moreover, 9 class members have no case manager; and in Queens County 9 case managers have caseloads greater than 20. The state made no effort to obtain a stay of this order but instead flagrantly disregarded it until the order was affirmed by the Court of Appeals on June 30, 1981.

Based upon the foregoing, the court finds noncompliance by the defendants with the provisions of the Consent Judgment above mentioned.

## II

In 1975, when Judge Judd signed the Consent Judgment, it was apparent to all that some type of monitoring of the state's obligations was necessary. Accordingly, the parties agreed to the appointment of a Review Panel (Consent Judgment ¶ 9 et seq.). The record shows that the progress made by the defendants in the first four and a half years after the entry of the 1975 Consent Judgment was in no small degree due to the monitoring, reporting and recommendations of the Review Panel. In 1979, however, the New York State Legislature deleted from the budget the funding provision for the Review Panel in the Consent Judgment and thereby for all intents and purposes removed the Review Panel from its monitoring position. Since that time, as might have been expected, conditions at Willowbrook have materially deteriorated. Consequently, the crucial issue which is now presented to the court is how can the court fashion a remedy to enforce compliance with its decree.

The court has always had the equity power to fashion the relief necessary to protect its judgment against future violations. *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); *Hart v. Community School Board of Brooklyn,* 383 F.Supp. 699, 755 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir. 1975). This power arises equally from consent judgments as well as final judgments following trials. *Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc.,* 274 F.2d 29 (7th Cir.1960); *Aspira v. Board of Education of City of New York,* 423 F.Supp. 647 (S.D.N.Y.1976). As stated by this Circuit: "[T]he district court [has] not only the power but the duty to enforce a settlement agreement which it [has] approved . . ." *Meetings & Expositions, Inc. v. Tandy Corporation,* 490 F.2d 714, 717 (2d Cir.1974). Accordingly, plaintiffs now move for the appointment of a special master to guarantee future compliance with the Consent Judgment.

Rule 53 of the Federal Rules of Civil Procedure expressly authorizes this procedure by the appointment of a special master as an exception to the general rule. Similar to the case at bar is *Gary W. v. State of Louisiana,* 601 F.2d 240 (5th Cir.1979), involving the level of care the State of Louisiana was providing its developmentally disabled citizens who found themselves in Texas institutions. In approving the district court's subsequent appointment of a Rule 53 special master, the court remarked that the appointment of a special master was not extraordinary, citing many cases involving similar facts and problems. Finally, the court observed:

> These proceedings have now been pending for over four years and a significant number of the children involved still have not been accorded the relief ordered. These two unfortunate facts belie the appellants' claim that the District Court abused its discretion in ordering the appointment of a Special Master.

*Id.* at 245. We have an almost identical situation here. Considering the past violations of the Consent Judgment, there is more than ample precedent to find exceptional circumstances justifying the appointment of a special master to protect the class members from harm.

But the court need not rely solely on Rule 53 for its equity power to provide itself with the appropriate instrument to enforce its decree. In the early case of *Ex Parte Peterson,* 253 U.S. 300, 312–13, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920), the Supreme Court, through Mr. Justice Brandeis, pointed out that this power derives from the courts'

> inherent power to provide themselves with appropriate instruments required for the performance of their duties ...

and

> to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause. From the commencement of our Government, it has been exercised by the federal courts, when sitting in equity, by appointing, either with or without the consent of the parties, special masters, auditors, examiners and commissioners.

To the same effect is *Schwimmer v. United States,* 232 F.2d 855, 865 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956), where the court said:

> Beyond the provisions of Rule 53, Federal Rules of Civil Procedure, 28 U.S.C.A., for appointing and making references to Masters, a Federal District Court has "the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential." (Citations omitted.)

Consequently, either under Rule 53 or in accordance with the court's inherent power to provide equitable relief, this court is able to appoint a special master to ensure compliance with its judgment.

The defendants offer many arguments why a special master should not be appointed predicated upon (i) their good faith and substantial performance; (ii) impossibility of performance because of changed conditions; (iii) creation of adversary relationships; (iv) duplication of efforts since Willowbrook is already monitored by fourteen separate agencies; and (v) violation of established principles of federalism.

The court has no doubt about the good faith of the defendants in attempting to comply with the Judgment, but the court does not find substantial performance. Good faith and efforts, however, are no excuse for failure to comply with provisions so necessary for the protection of the handicapped clients. *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir.1972); *Gautreaux v. Chicago Housing Authority,* 384 F.Supp. 37, 38 (N.D.Ill.1974). Defendants cite *Panitch v. State of Wisconsin,* 451 F.Supp. 132, 133–34 (E.D.Wis.1978), in support of their contention. *Panitch* presents an entirely different factual pattern than the situation here. In that case, involving an injunction compelling education of handicapped children, the School District had eliminated the backlog of handicapped students awaiting placement and also reduced the number of such students awaiting evaluation. In other words, there was substantial improvement and progress. In all events, such progress and improvement does not exist in this case. *See Welsch v. Likins,* 373 F.Supp. 487 (D.Minn.1974); *United States v. Dothard,* 373 F.Supp. 504 (M.D.Ala.1974).

As discussed under heading III below, performance is not impossible because of changed conditions. The claim of adversary relationships resulting from the appointment of a special master is simply not supported by evidence or experience.

It is true that Willowbrook is now monitored by fourteen different agencies, five of which existed before the entry of the Consent Judgment. The only two bodies which perform any monitoring against the decree, the Willowbrook Quality of Life Monitors ("QLM") and OMRDD's Consent Decree Office Audit Compliance Task Force ("CDO") consist entirely of defendants' employees. QLM monitors only Willowbrook, not the other facilities or homes, and CDO performs its monitoring function only once a year. Moreover, despite the existence of these fourteen monitoring groups, they have

failed to adequately supervise or in any way enforce full compliance with the Consent Judgment. What is needed is an independent body for compliance purposes which can orient and co-ordinate the reports and programs of the present agencies. In the successful performance of his services the special master would hasten the day when the Consent Judgment will be fully implemented. The role of the master would be to act "as an arm and as the eyes and ears of the court." *Palmigiano v. Garrahy,* 443 F.Supp. 956, 986 (D.R.I.1977). His duties would go beyond those of the present monitoring agencies. As a matter of fact, if the special master were satisfied with the accuracy and objectivity of the data now collected by OMRDD and the other monitoring bodies, there would be no necessity for him to engage in their particular activities. His task would be to integrate and harmonize that data for the purpose of implementing and enforcing compliance with the Consent Judgment, a task which none of the other bodies monitoring Willowbrook and related facilities can accomplish. Predicated upon her experience with a special master in Massachusetts, Commissioner Schwaninger recommended the appointment of a special master for the purpose of enabling the New York Commissioner to "respond to the needs of our mentally retarded population in a more timely way." (T. 5822).

Finally, defendants charge that the appointment of a special master under these circumstances would violate certain fundamental precepts of federalism, thus rendering such appointment unconstitutional. This argument may be divided into two contentions: the appointment would unconstitutionally interfere with New York State's right to direct its own affairs; and a mandate to New York to assume responsibility for compensating such a master would unconstitutionally interfere with New York's sovereign right to allocate its own tax dollars.

■ As to the first part of the argument, Rule 53, as heretofore pointed out, specifically authorizes the appointment of a special master and the cases are clear that such powers of monitoring by a special master are within the limitations of Rule 53. *Taylor v. Perini,* 413 F.Supp. 189 (N.D.Ohio 1976); *Costello v. Wainwright,* 387 F.Supp. 324 (M.D.Fla.1973), aff'd, 489 F.2d 1311 (5th Cir.1974). *See Gary W. v. Louisiana, supra; Amos v. Board of School Directors of City of Milwaukee,* 408 F.Supp. 765 (E.D.Wis.), aff'd sub nom. *Armstrong v. Brennan,* 539 F.2d 625 (7th Cir.1976), vacated on other grounds, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977); *Pennsylvania Ass'n for Retarded Children v. Pennsylvania,* 334 F.Supp. 1257 (E.D.Pa.1971), modified, 343 F.Supp. 279 (1972). *See also* Note, 91 Har. L.Rev. 428 (1977).

The court, of course, recognizes the delicate balance between the Judiciary, Legislature and the Executive. *Dimarzo v. Cahill,* 575 F.2d 15 (1st Cir.1978). Since the effect of the appointment of a special master would be prospective, it is not forbidden by the Eleventh Amendment. In fact, since the defendants have consented to this Judgment, it is difficult to see how they can interpose that bar. Indeed, *Edelman v. Jordan,* 415 U.S. 651, 667–68, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974), recognizes that such relief is available without a violation of the Eleventh Amendment even though the decree imposes financial burdens and will have fiscal consequences to a state treasury as the necessary result of compliance. *See Vecchione v. Wohlgemuth,* 558 F.2d 150, 158 (3d Cir.), cert. denied, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977). By appointing a special master the court does not control, manage or supervise the operation of Willowbrook. It simply seeks a tool by which it may monitor and enforce the state's performance of its obligations.

As for the second aspect of defendants' challenge, the court is aware of the fact that the specific allocation of state resources among its conflicting needs is a political matter to be resolved by the Legislature. *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *New York State Association for Retarded Children v. Carey,* 631 F.2d 162 (2d Cir.1980); *Evans v. Buchanon,* 582 F.2d 750 (3d Cir.

1978). It does not follow from this principle, however, that plaintiffs' constitutional rights or their right to full compliance with a consent judgment can be violated or ignored. If compliance requires the expenditure of funds the court thereby does not allocate the state's resources. It is the duty of the court to attempt to enforce its judgments. There are innumerable cases supporting the proposition that permits the assessment of costs against defendants for compensating a special master. *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Rhem v. Malcolm,* 507 F.2d 333 (2d Cir.1974); *Welsch v. Likins, supra; Hart, supra; Gary W., supra.* Moreover, Rules 53 and 54, F.R.Civ.P., specifically authorize the assessment of such costs against the defendants in these circumstances.

The court has decided to appoint a special master with full powers afforded under Rule 53, F.R.Civ.P. The appointment will not permit the special master to assume the operation of the Office of Mental Retardation and Developmental Disabilities nor to decide disputes between the parties. However, the master's efforts will be directed to the development of a plan to eliminate widespread violations of the Consent Judgment at Willowbrook and related facilities; to report periodically non-compliance with the provisions of the Consent Judgment; to assist in the accomplishment of the community placement provisions of the Consent Judgment; and finally, to monitor the implementation of the provisions of the Consent Judgment. Before such appointment, however, the court invites both parties to submit on or before the 14th day of May, 1982, two (2) names each of eligible persons for the appointment of a special master and to file with the court a plan suggesting the delineation of the duties and obligations of the special master and the funding necessary for his compensation and for an adequate staff and an adequately equipped office.

## III

### A

Defendants have moved for modification of paragraphs V(1), V(4) and V(7) of the Consent Judgment on the ground that such modification is necessary in order to realize the goal of community placement for Willowbrook class members. In support of their motion they rely on Rule 60 of the Federal Rules of Civil Procedure. Rule 60(b) provides that the court may relieve a party from a final judgment, order, or proceedings for the reasons set forth in subdivisions (5) and (6) as follows:

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.[23]

Defendants claim that the above sections of the Consent Judgment are no longer adapted to accomplish their purpose because of the housing shortage in New York City and the other obstacles mentioned by them which militate against community placement of non-ambulatory, non-self-preserving Willowbrook clients. The issue is whether "it is no longer equitable that the judgment should have prospective application."

The defendants' argument for modification is two-pronged. They contend, first, that size limitation is not that important a consideration for the Willowbrook population and that class members can be served as well—and in some cases better—in facilities that accommodate between 11 and 50 residents. Second, they argue that the interplay of current housing conditions in New York City with the Consent Judgment's rigid size restrictions has caused Willowbrook class members to remain in an institutional environment an unnecessarily long time. Consequently, they say, §§ V(4) and V(7) of the Consent Judgment[24] are

**23.** See paragraph 9 of the Consent Judgment specifying that this court retains jurisdiction.

**24.** Section V4 provides, in relevant part, that:

not properly adapted to accomplishing their purpose of providing class members with the least restrictive and most normal living conditions possible, and they should be abandoned.

We turn first to the argument that facilities accommodating between 11 and 50 residents provide as good—and in some instances better care—than the smaller community facilities presently mandated by the Consent Judgment and by the 3 bed/6 bed Order. The thrust of most of defendants' testimony was that size is not a critical factor in determining the best community placement for profoundly retarded persons. Professor Sue Allen Warren expressed the opinion that the compassion of staff, not the size of a facility, is the significant factor and that a mentally retarded person's developmental needs can be cared for as well in a 50-bed facility as in a 10-bed facility. In fact, in her opinion, a larger facility has important advantages: it can more easily obtain the necessary professional staff, there is less professional isolation, and mentally retarded individuals there have greater opportunities to develop friendships than they do in small facilities. Citing the work of Professor Landesman-Dwyer, she concluded that there is not enough clinical data to support the efficacy of the court's present size limitations, and that a range of community-based facilities should be developed.

Dr. Blanton stated that a range of facilities housing up to 100 mentally retarded individuals would be appropriate. He testified that while size is one factor to consider in developing community placements, location, availability of services and orientation of the community are more important.

> [D]efendants shall develop and operate or cause to be developed and operated, at least 200 new community placements to meet the needs of Willowbrook's residents and of the class. For purposes of this section ... a 'community placement' shall mean any non-institutional residence in the community in a hostel, half-way house, group home, foster care home, or similar residential facility of ... 10 or fewer beds for [the severely and profoundly retarded], coupled with a program element adequate to meet the resident's individual needs.

Commissioner Slezak concurred that a range of facilities should be developed. He testified that mental health practitioners should not force individuals into small units because of an illfounded preconception that smaller units are less restrictive, and that facilities larger than 10 beds are particularly appropriate placements for severely handicapped individuals who require nursing care or who have special disabilities such as behavior problems. In his opinion, residences housing up to 50 individuals can be home-like and can provide excellent care.

Ms. Blum agreed that a range of facilities should be considered for certain individuals. She continued that for those who are multiply handicapped or severely emotionally disturbed, both small and moderate-sized facilities are appropriate placements. Moreover, because intermediate-sized facilities are vastly superior to Willowbrook, difficult-to-place clients should be sent to them rather than just left to deteriorate at Willowbrook. Transitional placements in intermediate-sized facilities are also useful for assessing residents' abilities and needs before their final placement. Such assessments, she believes, cannot be done as expeditiously in the community as in intermediate-sized facilities, and they are not done adequately at Willowbrook.

Marc Brandt also endorsed the view that 35- and 50-bed facilities can be very humane and therapeutic. He stated that as transitional facilities they provide excellent alternatives to the institutionalized environment of Willowbrook, and they are good permanent homes for individuals who have such severe medical problems that they need continuous monitoring in a specialized facility.

Section V7 provides that:
> The community placement plan may recommend that additional community facilities and programs be developed and operated during the six months following recommendation of the plan, and shall recommend, by type and size of facility and program, the development and operation of a specified number of community facilities and programs, together with a recommendation for their development and operation.

Two of defendants' witnesses emphasized the medical barriers to placement in small facilities. Dr. Philip Ziring testified that the approximate 300 multiply handicapped residents at Willowbrook and the 115 residents at Flower Hospital require 24-hour access to medical experts. He opined that communities are not presently capable of providing adequate medical care, and therefore that multiply handicapped class members should not reside in facilities of 10 beds or fewer. Dr. Shervert Frazier agreed. Focusing on Flower Hospital residents, he testified that they have special needs that require immediate access to trained medical personnel. To justify the continuous presence of experts, physicians and therapists at any given facility, he believes, there must be a "critical mass" of disabled individuals, which a facility of 50 beds, but not a residence of 10 beds, can provide.

Experts for plaintiffs and *amicus* disagreed sharply with defendants. They testified that the size of a residence is the most critical factor in ensuring the growth and development of Willowbrook class members and that even individuals with behavior problems and medical disabilities benefit from placement in facilities of 10 residents or fewer. The reason size is so important, they asserted, is because of the severe developmental handicap of class members. Severely and profoundly retarded individuals, who comprise 85–90% of the Willowbrook population awaiting placement, have developmental levels between that of an infant and a two-year old. Commissioner Schwaninger, Dr. Clements and Commissioner Lensink contended that because of the class members' limited intelligence they can develop only if their programming and care are extremely consistent. Commissioner Schwaninger explained that the development of one or two close emotional relationships is vital for these individuals, for people who are so profoundly retarded start developing and growing at the basic level of emotional relationship. She added that although, theoretically, in a 35- or 50-bed facility, one staff person could be assigned permanently to 4 or 5 residents and a close emotional relationship could develop, because of the sheer demands of numbers, that does not occur.

Dr. Clements emphasized that consistency of programming is vital for these clients. The larger the facility the larger the number of employees who have to become totally familiar with an individual's program in order to deliver it in a consistent manner and the less likely appropriate programming will occur. Commissioner Lensink added that profoundly retarded individuals have a great deal of difficulty generalizing and integrating new skills. Consequently, in order for them to learn they must be in a small setting where they do not have to contend with a distracting panoply of activity. Small community residences are also better at reinforcing basic skills, such as tooth brushing, in an appropriate place, at an appropriate time, and with the undistracted attention of staff, so that the retarded individual can truly grasp what he is learning.

Barbara Gacek, who runs six small group homes and two satellites, agreed that the type of individualized program necessary for the severely retarded can best be accomplished in a facility for 10 residents. She testified:

We really feel that a small placement of ten is ideal to create a home-like environment for these children, to personalize their individual attention, to allow the staff to know each client, not just as a name but as a person with individual likes and dislikes, feelings and idiosyncracies, so if in our concept you are increasing the numbers, you are decreasing the ability to provide that kind of philosophy. . . .

One of the things that we are very insistent on is that our children's mental age is at best between 12 months and 3 years. They are, therefore, on a preconcrete or concrete level of development. If you are going to teach a skill you are going to have to teach it in the appropriate place at the appropriate time. The finger painting is, as an example, you cannot do finger painting in a dining room at 4:00 and then expect the children at 5:00 not

to finger paint with their chocolate pudding. They can't make that kind of an association. You have to make sure that the arts and crafts, every other skill, is done in the appropriate place.

Witnesses for plaintiffs and *amicus* agreed that small settings are particularly important for class members with behavior problems, for their problems are aggravated by larger groupings. They also challenged defendants' assertion that class members with medical problems cannot be placed in small community residences. Dr. Lorincz testified that less than a dozen Willowbrook residents needed hospital-style care. He explained that while multiply handicapped residents at Willowbrook are physically dependent, they are medically stable, and if staff has been trained to cope with their handicaps, these individuals' needs can be better met in a small group home than in a 20- or 50-bed facility. Lyn Rucker, who toured Flower Hospital, echoed his testimony, and stated that she saw only four Flower Hospital residents who needed long-term placement in a hospital and for whom a small community placement might be inappropriate. Commissioner Schwaninger, Commissioner Lensink, Lyn Rucker, and Gerald Provencal all testified that as directors of state community placement efforts, they had placed physically handicapped clients with the same types and degrees of handicapping conditions as those residents at Willowbrook and Flower Hospital into the community.

■ After serious consideration of all the evidence the court is persuaded by the plaintiffs' witnesses and is convinced that the needs of the Willowbrook class members are better met in small group homes than in facilities ranging in size from 11 to 50 beds. It should be noted that this conclusion is not the first determination in this case of the most appropriate placement for these individuals. After three years of litigation both plaintiffs and defendants agreed in 1975 that the objectives of integration and normalization were best accomplished for profoundly and severely retarded individuals by placement into facilities of 10 beds or fewer. Plaintiffs, as well as defendants, made concessions to obtain this agreement, which Judge Judd signed as a Consent Judgment. Then, in 1977 this court disapproved establishing Bronx Developmental Center as a transitional placement for class members, and in 1978, after a hearing, the defendants once again agreed with plaintiffs that small placements are important for the retarded, in that instance for the 115 multiply handicapped residents at Flower Hospital.

The thrust of defendants' current argument seems to be either that professional knowledge has changed or that practical experience has shown that the quality of care is the same in facilities sized from 1 to 50 residents, with the exception that for certain individuals, facilities larger than 10 beds are even better. Defendants have not demonstrated that professional opinion discounts size as an important factor in developing quality community placements. On the contrary, those experts with direct experience in placing clients similar to Willowbrook class members—including defendants' witness Dr. Blanton—concur that the trend throughout the country is towards smaller residences. It is true, as defendants point out, that from 1960–1970 Scandinavia developed numerous 40–60 bed facilities, but the result of that experience has been that professionals there are unhappy with the care provided in those facilities and want to replace them with smaller residences.[25]

It is clear to the Court that an essential purpose of the Consent Judgment, placement in small community facilities, is still an important goal. This is because residents in small community residences receive the type of individualized and consistent care necessary for them to develop to their full potential and because there they benefit from a setting that best approximates

**25.** The group studied in the article cited by Sue Allen Warren was primarily individuals who are moderately retarded.

the way most non-retarded people live. The upward limit of 10 is based upon experience and embodies the parties' agreement as the best way to ensure that community facilities will provide a nurturing home-like environment.

The evidence clearly demonstrates that institutions larger than 10 beds do not provide class members with as good care and as normalized an environment as do homes designed for 10 residents or fewer. Witnesses for both plaintiffs and defendants agree that the small group homes presently operating in New York State provide class members with excellent care. The evidence shows that the care provided in larger facilities, like Nina Eaton Center, Sullivan County ARC, Glen Oaks and Williamsburg, is non-individualized and regimented. In fact, as demonstrated above, most of these facilities fail, in important respects, to provide class members with the most basic services mandated by the Consent Judgment.

In addition, the evidence shows that group homes of 10 or fewer are better integrated into the community than facilities larger than 10. The rationale of the Consent Judgment's requirement that class members shall move from "segregated from the community to integrated with the community living and programming" is that retarded individuals model their behavior more appropriately from the example of and through access to nonretarded individuals, and they learn more readily and develop more fully from exposure to normal everyday living. Residents in group homes spend more time in the community than do residents in larger facilities. For example, in contrast to residents in small group homes, who go out to the community for programming on a daily basis, only two of the 35 Sullivan County ARC residents go out for programming and only 12 of the 48 Nina Eaton residents program outside of the institution.

By the same token, the larger the facility the less likely it is that residents will become part of the community and will be accepted by their neighbors. Larger community facilities exacerbate community opposition to and fear of the retarded. This is because neighbors have more difficulty adjusting to a large group of individuals who appear to be different, and have more difficulty in breaking down stereotypes in order to see these residents as individuals who happen to be retarded. In other words, their retardation continues to stigmatize residents in larger facilities, which can affect the way they view themselves, and the way neighbors, staff, and even their families, treat them.

Although the level of care at certain of the moderate-sized institutions is superior to that presently provided at Willowbrook, it is still inadvisable and unwise to develop these facilities as transitional placements. Four years ago the parties fully litigated the wisdom of developing transitional facilities when the state proposed to use the Bronx Developmental Center for such a purpose. At that time this court concluded that such a transitional placement would simply delay community placement and frustrate one of the chief purposes of the Consent Judgment. (Order, June 10, 1977). Experience since then has reenforced that conclusion. Class members who were transferred to the Bronx Developmental Center, pursuant to parental approval, were promised that they would be placed in the community within six to eight months. Of the 93 individuals placed in the Bronx Developmental Center since 1977, 63 are still there and one has died.[26] The defendants' additional arguments in favor of transitional placements—that certain individuals should acquire skills in a moderate sized facility or should be tested in such a facility before they are placed in small residences—are unpersuasive. The evidence shows that the same skills can be taught just as well, if not better, in group homes as in larger facilities. Because class members have great

---

**26.** In the six years since its opening, only 15 of the 46 class members placed at Nina Eaton Center have been placed into the community.

Since its opening ten months ago, no residents from Sullivan County ARC have been placed into the community.

difficulty generalizing skills they have learned in one environment to apply them in a different environment, placement in a transitional facility may, in fact, retard their development.

Defendants have failed to show that the special needs of any group of class members cannot be best served in facilities of 10 beds or fewer. Their main argument is that approximately 400 persons, who constitute about 17% of the class members still residing in institutions, cannot be placed because of severe medical problems necessitating special placement arrangements. Defendants have not offered any individualized medical evaluations of these class members to justify this statement. Indeed, they concede that no such assessments have been done.[27] Rather they make sweeping unsupported generalizations of the medical needs of all the multiply handicapped persons at Willowbrook and at Flower Hospital.

The facts show, however, that almost all of these clients are not precluded from placement in small community settings. Many of the multiply handicapped residents at Willowbrook are so classified because of physical handicaps, such as blindness, epilepsy, non-ambulation or deafness. As defendants admitted, class members with these types of physical handicaps already reside in the community. Almost all of the other medically involved residents have medical conditions that can be controlled in a community setting. Common complications are seizures, cardiac problems, scoliosis, contractures, cerebral palsy, chewing and swallowing difficulties and respiratory problems. As defendants acknowledge, persons with similar medical problems have been successfully placed in group homes in New York, as well as in other states.

The court recognizes that there are class members who, like anyone else, may need hospitalization from time to time or who, because of an illness or medical complication, may need longterm hospital care. Dr. Lorincz identified less than a dozen of such

individuals at Willowbrook, and the Deputy Director of Willowbrook agreed that only a "handful" of residents were unsuited for community placement. Lyn Rucker saw four individuals in that category at Flower Hospital, and Dr. Kugel, the Director of Flower Hospital, opined that perhaps fifteen Flower Hospital clients should not be placed. It is a huge and unwarranted leap, however, to conclude that unspecified medical complications that may preclude immediate placement of a few individuals should justify defendants' sweeping modification of placements for all 2400 institutionalized class members.

From the testimony, the court concludes that the overwhelming percentage of multiply handicapped clients who are not in need of hospitalization would not benefit from placement in moderate sized facilities instead of community group homes of 10 or fewer. Their specific medical needs can be met just as well in the community. Often, as Dr. Lorincz testified, their medical needs can be met relatively easily by training direct care staff or by providing the home with adaptive equipment. Some clients need regular visitation by medical personnel, and in a few limited cases the provision of staff with medical qualifications. In light of the better care and better staff accountability in small group homes and the clients' greater opportunity there for enriched living experiences, the multiply handicapped clients should be placed in small residential settings.

Individuals with behavior problems, including violent and self-abusive clients and those who chronically run away from home, can also benefit from placement in small community settings. Providers in New York, as well as providers in other states, routinely place these clients in the community. In fact, these types of clients are better served in small community settings, for staff there can give them more concentrated attention, and their problems are not further aggravated by their being kept in

---

**27.** Section V(2) requires individual evaluations to determine which community placement is best suited for each resident. The defendants

have not identified any specific class members at Willowbrook for whom placement into facilities larger than 10 beds is appropriate.

large groupings. Intensive behavior modification programs, as illustrated by Lyn Rucker's videotape of such a program in Nebraska, can be set up very appropriately in a community setting.

We address the defendants' second argument. They claim that the scarcity of available property in New York City makes the task of developing enough community placements, as currently defined by the Consent Judgment, overwhelmingly difficult, if not impossible, and that the pace of community placement is therefore unconscionably slow. It is the obligation of the Facilities Development Corporation ("FDC") and the New York City County Services Group of OMRDD to search for property that OMRDD can acquire, lease, or on which OMRDD can construct facilities. As a consequence of the extreme housing shortage in New York City, the available sites these organizations have been able to find for class members have dropped markedly. In the past three years OMRDD has opened only 131 of the 262 sites it had planned for New York City. Defendants point out that at the current rate of placement, community placement of remaining class members will take twenty years. They are bold enough to assert that under the present circumstances Section V(4) of the Consent Judgment has become an "instrument of wrong."

Upon this point defendants contend that the search for community residences for non-ambulatory non-self-preserving class members has been particularly difficult. Most of the state's community residences are constituted as intermediate care facilities for the mentally retarded ("ICF/MR's") under Title XIX of the Social Security Act of 1935, as amended, 42 U.S.C. § 1396 ("Medicaid program"). Under the Medicaid program the federal government pays 50% of the cost for community residences and the state and/or locality pays the balance. The difficulty is that in order to obtain federal funds, community residences with less than 15 beds, housing any individual incapable of self preservation,[28] must meet the stringent requirements of the institutional section of the National Fire Protection Association Life Safety Code. Most apartments and homes are not designed to house these types of individuals, and accordingly most small residences do not meet the stringent institutional code standards. According to the defendants, the FDC's search for facilities of 10 or fewer beds for the non-ambulatory non-self-preserving population therefore has been routinely unsuccessful. Although all facilities that house more than 15 individuals must also meet the stringent institutional code requirements, regardless of the capacities of the residents, the defendants contend that the larger facilities are more likely to be compliant with code standards.

Additional difficulties in placing class members cited by defendants are community opposition and restrictions imposed by New York Mental Hygiene Law § 41.34 (McKinney Supp.1981–82), commonly known as the "Padavan Law." Many neighborhoods oppose the development of community facilities for the retarded because of unfounded fears of child safety and a possible negative impact on local property values. Expression of these fears has caused OMRDD to lose several sites already acquired. The Padavan Law provides a mechanism by which communities can voice opposition to community facilities of 14 residents or fewer, first via Community Planning Boards, then to the Commissioner of OMRDD and finally in the state courts. While the defendants acknowledge that the law is helpful in providing a mechanism for dealing with community resistance they complain that the procedures outlined in the Law further slow the time-consuming process that the state undergoes in opening each community facility.[29] The

---

**28.** A non-self-preserving individual is defined as someone who is non-ambulatory or otherwise incapable of taking appropriate action to escape a fire.

**29.** Ms. Hoffman outlined fourteen steps the state takes to obtain a community residence. These include multiple approvals at various stages in the process by several state agencies. It takes approximately 9–10 months to lease a

court agrees with their complaint, but notes that the Padavan Law is a self-imposed delay.

■ The court likewise takes judicial notice of the current housing shortage in New York City and recognizes that defendants have recently encountered some difficulties in obtaining sites because of that shortage. A modification of the time schedule for community placement to account more realistically for impediments to placement is warranted. Accordingly, the court will extend the deadline for transferring Willowbrook class members to community facilities from April 1, 1981 to April 1, 1985.

The effect of the housing shortage has not been as devastating as defendants claim, however, and in part defendants have brought their difficulties upon themselves. Consequently, current circumstances do not present such hardship as would warrant modifying the Consent Judgment's 10-bed/15-bed community placement size limitation.

Defendants have introduced no evidence to show that the housing shortage in New York City is a permanent impediment. In fact, the only evidence submitted suggests either that the housing shortage is easing somewhat or that OMRDD is already managing to overcome its effects. In the past fiscal year OMRDD located only 28 residences. In this year 57 new community residences designed to accommodate approximately 450 persons will become available in the New York City area alone, and another 88 units, housing approximately 700 persons, are anticipated for fiscal year 1982–83. For the first time in the New York City area, construction of new group homes on vacant sites, which is not necessarily more expensive or time-consuming than leasing or acquiring existing facilities, is being tried by defendants. They have begun a program to construct 10-bed group homes for non-self-preserving individuals, which will accommodate at least 80–100 residents and possibly as many as 170–180.

Defendants acknowledge that the program can and should be expanded. Moreover, the housing shortage is not as far-reaching as is claimed. According to past-Commissioner James Introne there are enough or nearly enough residential sites "in the pipeline" to meet the court's community placement requirements in Staten Island and Brooklyn and probably enough in Queens. (T. 2781). The only real crunch in housing is located in Manhattan and the Bronx which the defendants could alleviate, as discussed *infra,* by relaxation of the state's "County of Origin" rule. The defendants have also introduced no evidence to show that they cannot obtain sites for self-preserving clients, who under the Medicaid program do not require community residences meeting the institutional Life Safety Code. In fact, Commissioner Introne acknowledged that housing is available for these individuals. (T. 2780–81).

It seems clear that the shortage of sites does not result solely, or even primarily, from the Consent Judgment's size limitation. To a significant extent defendants have unnecessarily created their own obstacles to placement as outlined below.

1. *Creation of unnecessary size prescriptions.* Defendants have limited the focus of their search to houses and apartments capable of accommodating 8–10 clients, concededly much more difficult to find than properties in the 4–6 bed range.

2. *Failure to hire sufficient site selection staff.* Defendants have only two full-time site searchers for all of New York City. Hiring only two site-searchers is not a concerted enough effort to conclude that appropriate sites cannot be found, considering that two years ago for a brief period defendants hired six site searchers.

3. *Failure to explore adequately the possibility of an equivalency system as a method of procuring funds for residences for non-self-preserving clients.* Defendants claim that the population most difficult to

---

residential site, and 12 to 13 months to acquire a site. As a result some available residential

sites have been lost.

place is the non-self-preserving. In light of the significance they attach to this assertion, the court is disappointed that defendants have failed to identify the number of non-self-preserving clients remaining to be placed.[30] However, based on the severity of retardation and the serious physical handicaps of many class members, the court is willing to accept the defendants' claim that the number of institutionalized non-self-preserving class members is large. It does not follow, though, that the Consent Judgment's size limitation blocks these individuals' placement. The National Bureau of Standards of the United States Department of Commerce has developed a fire safety equivalency system for use in group homes as an alternative to the more rigid proscriptions of the National Life Safety Code. Instead of automatically applying the strict institutional code to residences housing non-self-preserving clients, the equivalency system takes into account the characteristics of clients housed in the residence—for instance, the mix of non-ambulatory and ambulatory clients—and the response capability of staff. The equivalency system is available for New York State to adopt, with or without any changes the state may believe appropriate, and after obtaining the approval of the Department of Health and Human Services, to utilize for certification of Medicaid-funded facilities. The importance of this system is that its use permits certification of a greater number of facilities for non-self-preserving clients.

The defendants maintain that they are interested in the possibility of using the equivalency system, but they assert they cannot use it at the present time and consequently are using a more limited "waiver" system. Even assuming that defendants are correct, their contention that the Life Safety Code presents a permanent impedi-

ment to developing group homes is erroneous. The most that can be said for this argument is that the Code presents a temporary stumbling block and no more. Therefore, modification of the Judgment on this ground would be premature until the defendants have fully explored the usefulness of the equivalency system. Even without the equivalency system, Medicaid-certification of group homes for non-self-preserving clients is not impossible. In a survey defendants conducted for United Cerebral Palsy, they were able to certify approximately 64 of 90 3-bed apartments. Moreover, as defendants concede, a construction program is a viable alternative, and they are able to construct apartments for non-self-preserving residents that pass muster.

4. *Failure to consider alternatives to Medicaid funding.* Defendants' concerns about Medicaid requirements are primarily financial. The Life Safety Code applies only to facilities federally funded. If defendants allocated certain state funds to cover the cost of facilities for non-self-preserving clients, they could develop their own equivalency system that would not need federal approval.

Surprisingly enough, defendants were unaware of other avenues of federal support besides Medicaid funding. They did not know that federal funds are available under § 2176 of the Omnibus Budget and Reconciliation Act of 1981, 42 U.S.C. § 1396n(c), to provide for personal care, case management, home habilitation, respite care and other services for severely handicapped clients in virtually any community setting provided that those clients would need an ICF/MR level of care without such services. For example, these funds could be used to expand the state's family care program.[31]

---

**30.** Commissioner Introne acknowledged that he did not know how many non-self-preserving class members remain to be placed in the Boroughs of Bronx and Manhattan. Similarly, both Thomas Shirtz, OMRDD's Deputy Commissioner in Charge of New York City operations, and Anthony DiNuzzo, head of the ICF/MR survey team were unaware of the number of non-self-preserving clients that remain to be placed.

**31.** Defendants acknowledge that family care is a highly appropriate placement for class members. It also presents some advantages to the state. The approval process is less time-consuming than other community placements, and

5. *Failure to relax the State's "County of Origin" Rule.* OMRDD operates under a self-imposed "County of Origin" rule which mandates that clients will only be placed in the borough or county from which they were originally committed to Willowbrook. Although the rule has the salutory effect of dissipating community opposition to placement, relaxation of the rule, particularly for clients originally from Manhattan and the Bronx, seems imperative. Placement in these boroughs is much more difficult than in other areas in the state, and the "County of Origin" rule makes no intrinsic sense for many class members, as for example, non-correspondent clients (those who have no active family member to represent their interest) or those whose family members have moved from the area or are willing to have them placed further away in return for better care. While community opposition is a problem that must be faced, the court does not believe the opposition is sufficiently pervasive to preclude placement of Bronx and Manhattan class members into areas where there has been no substantial difficulty in establishing community residences. Relaxation of the "County of Origin" rule, like the other untried alternatives, should be attempted before any drastic modification of the present Judgment.

Costs of community placement are not an issue here. Although defendants seem to emphasize costs in support of their claim, it is sufficient to point out that the defendants 'have failed to show that the cost of placement in facilities with 10 beds or fewer is unreasonable or burdensome. In fact, Commissioner Slezak acknowledged that cost is not a problem confronting OMRDD in developing community placement for class members. Moreover, it has been established that community placement in either size facility is cheaper than keeping class members in institutions.

### B

■ In view of the evidence adduced, the legal requirements for the modification of the Consent Judgment, as requested by the

family care homes are not required to meet the

defendants, simply do not exist. The standard for modification is a finding of changed and unforeseen conditions creating a grievous wrong. The leading authority is *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). In that case the defendants sought a modification of an injunction prohibiting them in an antitrust suit from engaging in the sale of meat or groceries. The modification would have permitted the companies to re-enter the grocery business. Mr. Justice Cardozo, in reversing the lower court's order granting the modification, said:

> No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*Id.* at 119, 52 S.Ct. at 464. And again:

> What was then solemnly adjudged as a final composition of an historic litigation will not lightly be undone at the suit of the offenders, and the composition held for nothing.

*Id.* at 120, 52 S.Ct. at 464. Under similar circumstances the Court reaffirmed the teaching of *Swift* in *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968), where it said:

> a decree may be changed upon an appropriate showing, . . . [but] that it may *not* be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree . . . have not been fully achieved.

Subsequently, in 1977, the Second Circuit, citing *Swift,* held that to succeed the movant must show that the decree is not properly adapted to accomplish its purpose and "that under no circumstances can a constitutionally valid plan be wrung" from the

institutional Life Safety Code.

decree. *Chance v. Board of Examiners,* 561 F.2d 1079, 1086 (2d Cir.1977). It would seem to be elementary that a party cannot show changed conditions created by its own misconduct, or by a change in its own theory or thinking as justifying modification. The Third Circuit said in *Mayberry v. Maroney,* 558 F.2d 1159, 1163 (3d Cir.1977):

> The Commonwealth may not now artificially create its own "changed circumstances," and thus relieve itself from a free, calculated and deliberate choice, by offering a substitute remedy which provides a lesser safeguard against the injuries complained of on behalf of the class. Obviously this alternative remedy would be more convenient for the Commonwealth.

Nor have the defendants, as suggested by them, shown an impossibility of performance in support of their claims. Finally, as stated in *Ackerman v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 211, 95 L.Ed. 207 (1950), a party to a judgment cannot be relieved

> because hindsight seems to indicate to [it] that [its] decision ... was probably wrong.... There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

The court concludes that the defendants have failed to show exceptional circumstances or any grievous wrong as a basis for relief. Consequently, the motion for modification of the Consent Judgment will be denied.

### IV

Closely allied to their motion to modify the Consent Judgment is the defendants' motion to vacate this court's Order of October 22, 1979, which, in relevant part, reads as follows:

> that the defendants shall place the Gouverneur transferees presently residing at Flower Fifth Avenue Hospital in the community in residential facilities of no more than six (6) residents each; and it is further

> ORDERED, that commencing September 11, 1979, at least one-half (½) of all Gouverneur transferees residing at Flower Fifth Avenue Hospital who are placed in the community shall be placed in residential facilities of no more than three (3) residents each; and it is further

> ORDERED, that this Order shall be reevaluated by the parties not later than September 11, 1980, with respect to its appropriateness for and effects upon said Gouverneur transferees ...

Approximately two and a half years later 110 to 115 class members still remain at the Flower Hospital and only 26 have been moved to valid community facilities. It must be emphasized that all the parties agreed to this October 22, 1979 Order. In asking the court to relieve them of the obligation they assumed, the defendants emphasize their concern about the medical risks of small placements for Flower Hospital clients and their inability to find suitable sites. As discussed previously, the court rejects the claim that the medical needs of Flower Hospital clients require placements in larger facilities. On the contrary, the court finds that the Flower Hospital clients can best be served in facilities of 6 beds or fewer. As for the unavailability of sites, the defendants' efforts have been unimpressive. In their short-lived search for 3-bed and 6-bed units, defendants looked only in the Bronx and Manhattan, the two boroughs with the fewest number of available sites, and they confined their search to a radius of one-quarter mile from six hospitals, which, as established by expert testimony, was unnecessarily restrictive. Moreover, contributing to defendants' failure was Commissioner Introne's memorandum of February 20, 1981, which illegally ordered a halt to OMRDD's efforts to develop 3-bed units.

Defendants claim that the testimony at the hearing demonstrates that the 3-bed/6-bed Order is no longer "properly adapted to accomplishing its purposes," citing *King Seely Thermos Co. v. Alladin Industries, Inc.,* 418 F.2d 31 (2d Cir.1969). That case, which involved a trademark in-

fringement consent judgment, is inapposite because it does not refer to changed conditions. There the original judgment contained two conditions which were unnecessary at the time to accomplish its purposes of protecting the plaintiff. Accordingly those conditions were removed. *King Seely* did not eliminate the *ex post facto* "grievous wrong" requirement of *Swift, supra.* Here the conditions of the October 22, 1979 Order are necessary to accomplish the purposes of the Order and of the Consent Judgment and these purposes have not been accomplished as they had been in *King Seely*. Flower Hospital class members are profoundly retarded, non-ambulatory and subject to a wide variety of other handicapping conditions. There has been no change in the circumstances or any exceptional conditions justifying the vacation of this Order. The court notes, however, that a recent change in Medicaid reimbursement disallows federal funding for facilities that have fewer than four beds. 42 C.F.R. § 435.-1009(e). To permit defendants to receive such federal assistance, the court modifies the second paragraph of the October 22, 1979 Order by substituting "four (4)" for "three (3)".

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Conclusion

In summary, the court (1) declares the defendants in non-compliance with the terms and conditions of the Consent Judgment and hereby orders them to comply with all of said terms and conditions with all deliberate speed, and extends the deadline for compliance with the community placement provisions from April 1, 1981 to April 1, 1985; (2) will appoint a special master to monitor compliance; (3) denies defendants' motion to modify the 10/15-bed community placement limitation; (4) denies defendants' motion to vacate the court's Order of October 22, 1979, and modifies the 3/6-bed requirement to a 4/6-bed requirement; and (5) allows plaintiffs' counsel

costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, to be hereafter determined.

SO ORDERED.

### ORDER

Pursuant to Rule 53 of the Federal Rules of Civil Procedure, the Court's inherent equity power, the Consent Judgment of April 30, 1975, relative to the Staten Island Developmental Center and related facilities ("Willowbrook"), and this Court's decision and order of April 25, 1982, it is

ORDERED that the defendants are hereby enjoined from further violating the terms and conditions of the Consent Judgment, and that:

1. Dr. Rudy Magnone of 3537 Wenwood Dr., Columbus, Ohio 43220, is hereby appointed Special Master (the "Master"), (which hereinafter shall include other staff or consultants employed by the Master), to monitor full compliance with all the terms and conditions of the Consent Judgment.

2. In connection with his appointment, the Master shall review the auditing practices and reports of the fourteen existing monitoring groups for accuracy and objectivity, and shall integrate and harmonize, as far as possible, the data in each of these reports. After meeting with plaintiffs and defendants, the Master shall construct an audit protocol and instrument which shall utilize to the fullest extent possible and practical the reports of existing monitoring bodies relating to Willowbrook. Such integration of existing reports will not necessarily constitute an agreement therewith.

3. The Master is authorized at present to employ two full-time assistants and one full-time secretary with the appropriate experience in mental retardation and/or institutional administration to assist the Master in performing his duties. Wherever possible expense shall be minimized by calling on clerical aides or staff members available from the State to provide the investigation and information necessary to ascertain facts. Defendants shall at their expense provide adequate office space (at least 4-

room suite), telephone service, postage, clerical staff, typewriters, and similar support equipment to enable the Master to carry out his duties. In case of a failure by the State to promptly furnish the Master with such facilities, the Court shall, upon the Master's application, authorize such further expenditures as are necessary for that purpose.

4. The Master's staff shall periodically compile written reports showing in detail the degree of progress with respect to implementation of the Consent Judgment and specifying recommendations for consideration by the Master, and shall perform such other duties as the Master directs.

5. The Master and his staff shall be allowed full access to all information, records (including budget records), buildings and areas covered by the Consent Judgment and shall be permitted to interview any member of the class or any employee of defendants, at reasonable times and places, to the extent necessary to the discharge of his duties.

6. Any interference with the Master or his staff in connection with their performance of the duties described herein, by any person having notice of the contents of this Order, may be punishable as contempt of court and subject to other sanctions provided by law.

7. All reports submitted to the Master by his staff or by consultants shall be available for inspection and copying by all parties to this action.

8. In addition to those powers described above, the Master shall have the authority to:

(a) Require the defendants or their agents or any person who provides services to class members to submit any reports necessary to assist the Master in performing his duties, including programs, records and evaluations of individuals, and to assist in accomplishment of the community placement provisions of the Consent Judgment;

(b) Provide advice and assistance to the parties in implementing the Consent Judgment and subsequent orders;

(c) Issue such reports to the parties and the Court as he deems useful in performing his duties;

(d) Consult with all parties and interested persons and bodies concerning implementation of the Consent Judgment and subsequent orders;

(e) Identify specifically any terms of the Consent Judgment with which defendants are not in compliance. He may recommend a resolution of any disagreements which arise concerning compliance with the terms of the Consent Judgment or the interpretation or application of the steps, standards and procedures contained in Appendix "A" to the Consent Judgment. Such recommendations shall be communicated in writing to the following: defendants, counsel for defendants, counsel for plaintiffs, counsel for United States, New York City Regional Director of Mental Retardation and Developmental Disabilities, and such other persons as the Master deems appropriate.

9. All parties shall be bound by the recommendations of the Master issued pursuant hereto, unless within 15 business days following receipt of such recommendations they serve on all other parties and file with the Master a written objection to such recommendations. The filing of such an objection by any party shall automatically stay the effect of any such recommendation until further order of the Court. Within ten (10) days of receipt of written objections, the Master or any other party, may apply to the Court for a hearing to determine whether the recommendations to which objection has been made should be adopted. Such applications shall be upon prior written notice to all parties and to the Master.

10. In order to achieve the goal of compliance with and enforcement of the Consent Judgment, information investigations by the Master may be conducted as informal working sessions. Informal private consultations without the presence of counsel are permitted but the fact that such meetings were held shall be made known to all counsel by the Master keeping a record of them and making the record available.

11. Necessary expenses for carrying out the Master's duties shall be promptly paid to the Master and his staff by the defendants pursuant to Rule 53, F.R.Civ.P., and shall be taxed as part of the costs of this case against the defendants in their official capacities arising from the enforcement of full compliance by the defendants with the Consent Judgment. As such, they will be an obligation of the State and no specific application to the legislature for funding will be necessary.

12. Pursuant to the foregoing, the defendants shall bear the costs of the following personnel and expenses of the Master:

| | | |
|---|---|---|
| (1) | Special Master—$325 per diem—not to exceed 150 days per year | $ 48,750.00 |
| (2) | One full-time secretary (exclusive of benefits) | 20,000.00 |
| (3) | Two full-time professional staff members, at $35,000 apiece (exclusive of benefits) | 70,000.00 |
| (4) | Expenses of the Master for food and lodging—$85 per day (estimated: 150 days per year) | 12,750.00 |
| (5) | Travel expenses | 7,500.00 |
| (6) | Miscellaneous | 10,000.00 |
| | Estimated Total (exclusive of benefits) | $169,000.00 |

If the above-mentioned estimate is proved to be insufficient to properly monitor the Consent Judgment, either party, including the Master, may apply to the Court for a proper adjustment to accomplish the foregoing purposes.

13. The Master shall have no authority to exercise any control or management over the operation of any facility operated or licensed by the State of New York, but he shall have authority to monitor the location and acquisition of community placement facilities in order to meet the placement goals of the Consent Judgment, and to make a report to the parties with respect thereto.

14. The Master shall provide advice and assistance to the parties in implementing the Consent Judgment and subsequent orders, and shall consult with experts, the parties and interested persons and bodies concerning the implementation of the Consent Judgment and subsequent orders. The cost of any expert consultations shall, subject to the approval of the Court, be paid by defendants.

15. Each quarter the Master shall submit an accounting and a new proposed budget to the Court for approval in accordance with the provisions of this Order. He shall also submit an annual accounting to the Court.

16. Defendants and all of their agents, as well as public agencies of the State of New York, are directed to cooperate fully with the Master in order to accomplish the purposes of this order.

17. The Master shall begin service within two weeks from the date of this order and shall serve until discharged by the Court.

18. Jurisdiction of this case is retained by the Court until further order.